**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT of PENNSYLVANIA**

| | |
|---|---|
| KRISHNA KISHOR DEVARAKONDA and BRIAN FOSTER, derivatively on behalf of INOVIO PHARMACEUTICALS, INC., | Case No.: |
| Plaintiffs, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| J. JOSEPH KIM, SIMON X. BENITO, ANGEL CABRERA, ANN C. MILLER, JAY P. SHEPARD, DAVID B. WEINER, WENDY L. YARNO, and LOTA S. ZOTH, | |
| Defendants, | |
| and | |
| INOVIO PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiffs Krishna Kishor Devarakonda and Brian Foster ("Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Inovio Pharmaceuticals, Inc. ("Inovio" or the "Company"), file this Verified Shareholder Derivative Complaint against Individual Defendants J. Joseph Kim, Simon X. Benito, Angel Cabrera, Ann C. Miller, Jay P. Shepard, David B. Weiner, Wendy L. Yarno, and Lota S. Zoth (collectively, the "Individual Defendants" and together with Inovio, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Inovio, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for their complaint against the Defendants,

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Inovio, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Inovio's directors and officers between February 14, 2020 and continuing through the present (the "Relevant Period").

2. Inovio is a biotechnology company based in Plymouth Meeting, Pennsylvania. The Company purports to research and develop medicines designed to treat certain cancers and infectious diseases, including, most recently, the novel coronavirus, Coronavirus Disease 19 ("COVID-19").

3. Since December 2019, the world has been engulfed in a pandemic brought on by the rapid spread of COVID-19. This pandemic is one of the most serious public health crises in recent history, and at the time of the filing of this action, over a million cases of the virus have been reported worldwide, with the death toll approaching 100,000.

4. The COVID-19 pandemic has also radically altered daily life across the planet, and in particular in the United States, which is quickly becoming the epicenter of the outbreak. Many states have taken unprecedented measures to stop the spread of the virus, including ordering all

non-essential personnel to work from home, cancelling classes at public schools and universities, and banning large public gatherings, among other things.

5.      Because of the novel status of COVID-19, and the breakneck pace at which it has spread across the planet, there is currently no viable COVID-19 vaccine available. In recent months, the medical and scientific communities have mobilized to work on developing such a vaccine—however, even if the development of a vaccine candidate is accelerated beyond normal rates, most projections indicate that it will take at least a year for a successful COVID-19 vaccine to be ready for production.

6.      In the midst of this ongoing crisis, during the Relevant Period, the Individual Defendants capitalized on the clear demand for a COVID-19 vaccine in order to, among other things, artificially inflate the Company's stock price. Specifically, the Individual Defendants, and in particular Defendant Kim, the Company's Chief Executive Officer ("CEO") represented to the public during interviews, in a filing with the SEC, and even during a televised meeting at the White House that Inovio, astonishingly, had already developed a COVID-19 vaccine in only three hours, and that such vaccine would be ready for human trials as early as April 2020.

7.      Such representations were utterly false. Inovio had not developed a working vaccine for COVID-19, but rather, a "vaccine construct," i.e., an early stage prototype that after extensive clinical trials, could eventually lead to a viable vaccine.

8.      For a time, these misrepresentations had the desired effect. Following certain of these false and misleading statements, the price of the Company's stock shot up dramatically, from as low as $4.15 per share at the close of trading on February 14, 2020, at the start of the Relevant Period, to a high of $19.36 per share during intra-day trading on March 9, 2020.

9.     The truth emerged during the day on March 9, 2020, when Citron Research ("Citron"), an online investment newsletter and short-seller known for exposing companies engaged in fraud, made a post on its Twitter account calling for the SEC to "investigate the ludicrous and dangerous claim that [Inovio] designed a vaccine in 3 hours."

10.     That same day, the Company posted a statement on its own Twitter account attempting to downplay Citron's claims. In its Twitter statement, the Company admitted to the public that Inovio's purported COVID-19 vaccine, which had been developed "within three hours," was not a fully-fledged vaccine at all, but merely a construct for a vaccine.

11.     On this news, the price of the Company's stock began a two-day freefall, dropping from $14.09 per share at the close of trading on March 6, 2020, the prior trading day, to $5.70 at the close of trading on March 10, 2020. This two-day stock drop represented a loss in value of over 59%, and expunged roughly $643 million in the Company's market capitalization.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Inovio had not developed a viable COVID-19 vaccine in only three hours, but rather a vaccine construct; (2) the Company had no reason to believe that clinical trials for Inovio's purported COVID-19 vaccine would begin as soon as April 2020; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public, while one of the Individual Defendants engaged in an improper insider sale, netting proceeds of approximately $63,000.

14.     Additionally, the Individual Defendants breached their fiduciary duties by failing to maintain internal controls.

15.     In light of the Individual Defendants' misconduct, which has subjected the Company and its CEO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Pennsylvania (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the liability of the CEO in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of Inovio's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

18.     Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

20.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiffs and the Individual Defendants are citizens of different states and countries and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

24.     Venue is proper in this District because Inovio and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

25.     Plaintiff Krishna Kishor Devarakonda is a current shareholder of Inovio. He has continuously held Inovio common stock at all relevant times. He is a citizen of Canada.

26.     Plaintiff Brian Foster is a current shareholder of Inovio. He has continuously held Inovio common stock at all relevant times. He is a citizen of the State of Florida.

### Nominal Defendant Inovio

27.     Inovio is a Delaware corporation with its principal executive offices at 660 W. Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania 19462. Inovio's shares trade on the NASDAQ Stock Exchange ("NASDAQ"), under the ticker symbol "INO."

### Defendant Kim

28.     Defendant Kim has served as the Company's President, CEO, and as a director since 2009. He also serves as a member of the Finance Committee. According to the Company's Schedule 14A filed with the SEC on March 27, 2020 (the "2020 Proxy Statement"), as of March 17, 2020, Defendant Kim beneficially owned 2,992,074 shares of the Company's common stock, which represented 2% of the Company's outstanding shares as of that date. Given that the price per share of the Company's common stock at the close of trading on March 17, 2020 was $7.34, Defendant Kim owned approximately $21.9 million worth of Inovio common stock.

29.     For the fiscal year ended December 31, 2019, Defendant Kim received $2,588,534 in compensation from the Company. This included $837,735 in salary, $638,274 in stock awards, $642,803 in option awards, $457,222 in non-equity incentive plan compensation, and $12,500 in all other compensation.

30.     The 2020 Proxy Statement stated the following about Defendant Kim:

*J. Joseph Kim, Ph.D.* has served as our President and Chief Executive Officer and as a director since 2009. Dr. Kim qualifies to serve on our Board given his broad scientific and industry experience and his experience as our Chief Executive Officer. He was co-founder of our subsidiary VGX Pharmaceuticals, Inc. ("VGX"), and also served as its President and Chief Executive Officer and a director from 2000 until its merger with us in 2009. He previously worked at Merck & Company, Inc. developing vaccines. An immunologist by training, Dr. Kim holds an undergraduate degree from the Massachusetts Institute of Technology ("MIT"), a Ph.D. in biochemical engineering from the University of Pennsylvania, and an MBA from The Wharton School at the University of Pennsylvania. He has published more than 100 scientific papers, holds numerous patents, and sits on editorial boards and scientific review panels. He also serves on the board of the International Vaccine Institute and the Council of Korean Americans. The World Economic Forum selected Dr. Kim as a member of its Global Agenda Council and named him a Technology Pioneer as well as one of its Young Global Leaders. MIT's Technology Review magazine called him "one of the world's top innovators." Dr. Kim is a Fellow of the inaugural class of the Health Innovators Fellowship and a member of the Aspen Global Leadership Network where he is working with a team to develop a vision of tomorrow's healthcare system.

31.     Upon information and belief, Defendant Kim is a citizen of the State of Pennsylvania.

**Defendant Benito**

32.     Defendant Simon X. Benito ("Benito") has served as the Chairman of the Board since January 2019, and as a director since 2003. He also serves as the Chair of the Finance Committee, and as a member of the Audit Committee and the Nomination and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 17, 2020, Defendant Benito beneficially owned 154,150 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2020 was $7.34, Defendant Benito owned approximately $1.13 million worth of Inovio common stock.

33.     For the fiscal year ended December 31, 2019, Defendant Benito received $162,563 in compensation from the Company. This included $100,000 in fees earned or paid in cash, $31,251 in stock awards, and $31,312 in option awards.

34.     The 2020 Proxy Statement stated the following about Defendant Benito:

*Simon X. Benito* has served on our Board since December 2003 and qualifies to serve on our Board as he brings to our Board formal accounting and financial training and expertise, significant public company board experience, senior management experience in the health care industry, and important industry contacts. Prior to his retirement, Mr. Benito had a successful and extensive career serving several multinational corporations in senior executive positions, including 25 years at Merck & Company, Inc. His most recent positions included Senior Vice President, Merck Vaccine Division; Executive Vice President, Merck-Medco Managed Care; and Executive Director and Vice President, Merck Human Health, Japan. In addition, Mr. Benito was a Fellow of the Institute of Chartered Accountants in England and Wales for over 30 years until his retirement in 1999. Since April 2005, Mr. Benito has served as a director of DURECT Corporation, a publicly traded specialty pharmaceutical company.

35.     Upon information and belief, Defendant Benito is a citizen of the State of New York.

**Defendant Cabrera**

36.     Defendant Angel Cabrera ("Cabrera") served as a Company director since June 2012. He also served as the Chair of the Nomination and Corporate Governance Committee, and as a member of the Compensation Committee. Defendant Cabrera was not nominated for re-election at the Company's annual meeting of shareholders held on May 8, 2019, and stepped down from the Board on May 14, 2020. According to the 2020 Proxy Statement, as of March 17, 2020, Defendant Cabrera beneficially owned 169,352 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2020 was $7.34, Defendant Cabrera owned approximately $1.24 million worth of Inovio common stock.

37.     For the fiscal year ended December 31, 2019, Defendant Cabrera received $124,563 in compensation from the Company. This included $62,000 in fees earned or paid in cash, $31,251 in stock awards, and $31,312 in option awards.

38.     The Company's Schedule 14A filed with the SEC on March 25, 2019 (the "2019 Proxy Statement" stated the following about Defendant Cabrera:

> *Angel Cabrera, Ph.D.* joined our Board in June 2012 and qualifies to serve on our Board as he brings significant experience in corporate governance and management. Dr. Cabrera has served as President of George Mason University, the largest research university in Virginia, since July 2012. Previously he led two internationally renowned business schools: Thunderbird School of Global Management at Arizona State University and IE Business School in Madrid. Prior to IE he was a change management consultant with Accenture. Dr. Cabrera earned his Ph.D. and M.S. in psychology and cognitive science from the Georgia Institute of Technology, which he attended as a Fulbright Scholar, and his B.S. and M.S. in computer and electrical engineering from Madrid's Polytechnic University. He has received several leadership recognitions from the World Economic Forum, the Aspen Institute, Business Week and other publications. His publications in management, leadership, psychology and higher education have been cited over 4,000 times. Dr. Cabrera is an advocate of corporate social responsibility and managerial professionalism. He serves on the board of directors of the Federal Reserve Bank of Richmond and several non-profit and academic boards, including Georgia Institute of Technology, and has served on the boards of two other public companies.

39.     Upon information and belief, Defendant Cabrera is a citizen of the State of Virginia.

**<u>Defendant Miller</u>**

40.     Defendant Ann C. Miller ("Miller") has served as a Company director since March 2019. She also serves as a member of the Audit Committee and the Compensation Committee. According to the 2020 Proxy Statement, as of March 17, 2020, Defendant Miller beneficially owned 34,787 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2020 was $7.34, Defendant Miller owned approximately $255,336 worth of Inovio common stock.

41.     For the fiscal year ended December 31, 2019, Defendant Miller received $200,442 in compensation from the Company. This included $42,250 in fees earned or paid in cash, $78,945 in stock awards, and $79,247 in option awards.

42.     The 2020 Proxy Statement stated the following about Defendant Miller:

*Ann C. Miller, M.D.* joined our Board in March 2019 and brings to the Board her years of commercial experience in the biopharmaceutical industry and her clinical training. Dr. Miller worked at Sanofi S.A. from 2012 until her retirement in September 2018, serving as Vice President of Marketing and Vice President of Global Marketing, Oncology Division. From 2009 to 2011, Dr. Miller served as Senior Vice President at Eisai Co., Ltd. leading the Primary Care and Specialty Business unit and then Pharmaceutical Services. Dr. Miller previously served in management roles in global and U.S. marketing at Amgen, Inc. for five years and in positions of increasing responsibility at Merck & Co., Inc. over 16 years. Dr. Miller has served on the board of directors of the publicly traded company Puma Biotechnology, Inc. since November 2019. Dr. Miller received an M.D. from the Duke University School of Medicine and a B.A. in chemistry, summa cum laude, from Duke University.

43.     Upon information and belief, Defendant Miller is a citizen of the State of Massachusetts.

**Defendant Shepard**

44.     Defendant Jay P. Shepard ("Shepard") has served as a Company director since January 2020. He also serves as a member of the Finance Committee. According to the 2020 Proxy Statement, as of March 17, 2020, Defendant Shepard beneficially owned 5,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2020 was $7.34, Defendant Shepard owned approximately $36,700 worth of Inovio common stock.

45.     The 2020 Proxy Statement stated the following about Defendant Shepard:

*Jay P. Shepard* joined our Board in January 2020 and qualifies to serve on our Board as a result of his years of healthcare and financial experience. Mr. Shepard was President and Chief Executive Officer of Aravive, Inc. (formerly Versartis, Inc.) from May 2015 to January 2020 and has served as a member of its board of directors since 2013 and as its Chairman since January 2020. From 2012 until May 2015, Mr. Shepard was an Executive Partner at Sofinnova Ventures, a venture capital firm focused on the healthcare industry, which he joined as an Executive in Residence in 2008. From 2010 to 2012, Mr. Shepard served as President and Chief Executive Officer and was a member of the board of directors of NextWave Pharmaceuticals, Inc., a specialty pharmaceutical company developing and commercializing unique pediatric products utilizing proprietary drug delivery technology that was acquired by Pfizer, Inc. From 2005 to 2007, Mr. Shepard

served as President and Chief Executive Officer and a member of the board of directors of Ilypsa, Inc., a biopharmaceutical company pioneering novel non-absorbed polymeric drugs for renal and metabolic disorders that was acquired by Amgen Inc. Mr. Shepard currently serves on the board of directors of Esperion Therapeutics, Inc., a publicly traded pharmaceutical company, and of the Christopher & Dana Reeve Foundation. Within the past five years, Mr. Shepard also served on the boards of directors of the public companies Marinus Pharmaceuticals, Inc. and Durect Corporation. Mr. Shepard holds a B.S. in Business Administration from the University of Arizona.

46.     Upon information and belief, Defendant Shepard is a citizen of the State of California.

**Defendant Weiner**

47.     Defendant David B. Weiner ("Weiner") has served as a Company director since March 2016. He also serves as Chairman of the Company's Scientific Advisory Board. According to the 2020 Proxy Statement, as of March 17, 2020, Defendant Weiner beneficially owned 1,259,373 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2020 was $7.34, Defendant Weiner owned approximately $9.24 million worth of Inovio common stock.

48.     For the fiscal year ended December 31, 2019, Defendant Weiner received $397,594 in compensation from the Company. This included $45,000 in fees earned or paid in cash, $148,151 in stock awards, and $204,443 in option awards.

49.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Weiner made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 3/9/2020 | 3,500 | $18.00 | $63,000 |

50.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

51.     The 2020 Proxy Statement stated the following about Defendant Weiner:

*David B. Weiner, Ph.D.* joined our Board in March 2016 and qualifies to serve on our Board as he is a recognized leader in immunology as well as in gene vaccines and therapy. Since 2016, Dr. Weiner has served as Executive Vice President and Director of the Vaccine Center at The Wistar Institute, the nation's first independent biomedical research institute, which is also an NCI-designated Cancer Center and an international leader in cancer, immunology and infectious disease research. Dr. Weiner is also the W. W. Smith Charitable Trust Professor of Cancer Research at The Wistar Institute. Previously, Dr. Weiner was Professor of Pathology & Laboratory Medicine at the University of Pennsylvania and Chair of the Gene Therapy and Vaccine Program at the University's Perelman School of Medicine. He has more than 350 peer-reviewed publications in scientific journals, including mainstream scientific journals such as Scientific American, and has been designated by the Institute for Scientific Information as one of the top-cited scientists in the world. An inventor and holder of more than 100 issued and pending U.S. patents, Dr. Weiner has received numerous honors including election as a fellow to the American Association for the Advancement of Science in 2011 and the International Society for Vaccines in 2012. He was the recipient of the NIH Director's Transformative Research Award and received the Vaccine Industry Excellence Award for Best Academic Research Team in 2015 at the World Vaccine Congress. Dr. Weiner was honored with the prestigious Hilleman Lectureship in 2015 at the Children's Hospital of Philadelphia Grand Rounds session and received a Stone Family Award from Abramson Cancer Center for his groundbreaking work on DNA vaccines for cancer immune therapy. Dr. Weiner holds a Ph.D. in developmental biology from the University of Cincinnati College of Medicine, an M.S. in biology from the University of Cincinnati and a B.S. in biology from SUNY at Stony Brook in Stony Brook, New York.

52.     Upon information and belief, Defendant Weiner is a citizen of the State of Pennsylvania.

**Defendant Yarno**

53.     Defendant Wendy L. Yarno ("Yarno") has served as a Company director since December 2017. She also serves as the Chair of the Compensation Committee, and as a member of the Nomination and Corporate Governance Committee. According to the 2020 Proxy Statement,

as of March 17, 2020, Defendant Yarno beneficially owned 64,363 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2020 was $7.34, Defendant Yarno owned approximately $472,424 worth of Inovio common stock.

54.     For the fiscal year ended December 31, 2019, Defendant Yarno received $127,563 in compensation from the Company. This included $65,000 in fees earned or paid in cash, $31,251 in stock awards, and $31,312 in option awards.

55.     The 2020 Proxy Statement stated the following about Defendant Yarno:

*Wendy L. Yarno* joined our Board in December 2017 and qualifies to serve on our Board as a result of her years of experience in the pharmaceutical industry. Ms. Yarno retired in September 2008 from Merck & Company, Inc. following a 26-year career in commercial and human resource positions of increasing seniority, most recently as Chief Marketing Officer before she retired. Ms. Yarno also spent part of her career at Johnson & Johnson, Inc. in commercial positions. Ms. Yarno currently serves on the boards of directors of the publicly traded companies Global Blood Therapeutics, Inc., MyoKardia, Inc. and Ideaya Biosciences, Inc. Within the last five years, Ms. Yarno served on the board of directors of Alder Biopharmaceuticals, Inc., Aratana Therapeutics, Inc., Medivation, Inc. and St. Jude Medical, Inc. Ms. Yarno holds a B.S. in Business Administration from Portland State University and an M.B.A. from Temple University.

56.     Upon information and belief, Defendant Yarno is a citizen of the State of Arizona.

**Defendant Zoth**

57.     Defendant Lota S. Zoth ("Zoth") has served as a Company director since January 2019. She also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee and the Finance Committee. According to the 2020 Proxy Statement, as of March 17, 2020, Defendant Zoth beneficially owned 34,603 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2020 was $7.34, Defendant Zoth owned approximately 253,986 worth of Inovio common stock.

58.    For the fiscal year ended December 31, 2019, Defendant Zoth received $242,425 in compensation from the Company. This included $72,000 in fees earned or paid in cash, $83,766 in stock awards, and $86,659 in option awards.

59.    The 2020 Proxy Statement stated the following about Defendant Zoth:

*Lota S. Zoth* joined our Board in January 2019 and qualifies to serve on our Board as a result of her years of experience in senior financial roles in a variety of commercial-stage companies over a 35-year career. She currently serves as the chairman of the board of directors of the publicly held biopharmaceutical company Zymeworks, Inc. and also serves on the board of directors of the publicly held biopharmaceutical company Lumos Pharma, Inc. (formerly NewLink Genetics Corporation). Within the last five years, she also served on the boards of directors of the public companies Spark Therapeutics, Inc. and Orexigen Therapeutics, Inc. (which was granted relief under Chapter 11 of the U.S. Bankruptcy Code in 2019). Prior to her board service, she served in senior financial roles in a variety of commercial-stage companies, including serving as MedImmune Inc.'s corporate controller from 2002 to 2004 and its chief financial officer from 2004 until its acquisition by AstraZeneca in 2007. Prior to joining MedImmune in 2002, Ms. Zoth served in financial executive roles at PSINet Inc., Sodexho Marriott Services, Inc., Marriott International and PepsiCo, Inc. Ms. Zoth also served as an auditor at Ernst & Young, LLP and is a Certified Public Accountant. Ms. Zoth holds a B.B.A. in accounting from Texas Tech University.

60.    Upon information and belief, Defendant Zoth is a citizen of Washington, D.C.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

61.    By reason of their positions as officers, directors, and/or fiduciaries of Inovio and because of their ability to control the business and corporate affairs of Inovio, the Individual Defendants owed Inovio and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Inovio in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Inovio and its shareholders so as to benefit all shareholders equally.

62.     Each director and officer of the Company owes to Inovio and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

63.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Inovio, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

64.     To discharge their duties, the officers and directors of Inovio were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

65.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Inovio, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

66.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

67.     To discharge their duties, the officers and directors of Inovio were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Inovio were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, and the United States, and pursuant to Inovio's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Inovio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Inovio and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Inovio's operations would comply with all applicable laws and Inovio's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

68.     Each of the Individual Defendants further owed to Inovio and the shareholders the duty of loyalty requiring that each favor Inovio's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

69.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Inovio and were at all times acting within the course and scope of such agency.

70.     Because of their advisory, executive, managerial, and directorial positions with Inovio, each of the Individual Defendants had access to adverse, non-public information about the Company.

71.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Inovio.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

72.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

73.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

74.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

75.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

76.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Inovio, and was at all times acting within the course and scope of such agency.

### INOVIO'S CODE OF CONDUCT

77.    The Company's Code of Conduct provides that it "sets forth the basic principles that guide Inovio's conduct," that it "applies to all officers, directors, and employees of Inovio Pharmaceuticals, Inc."

78.    In a section titled, "Comply with Laws, Rules, Regulations and Ethics," the Code of Conduct states the following, in relevant part:

> As a publicly-traded U.S.-based company in a highly regulated industry that operates globally, the Company's conduct is subject to many laws, rules, and regulations. The Company requires all employees – regardless of job, title, or function – to comply with all laws, rules, and regulations applicable to the Company wherever it does business. Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built.

> In addition to strictly complying with all laws, rules, and regulations, you are also expected to know, understand, and comply with this Code. This Code outlines the company's position on the respective areas presented and serves as a roadmap for you to act in an ethical manner. If you are ever uncertain about a course of conduct or encounter a potential issue, please be sure to review this Code, the relevant Employee Handbook for your location, and any department-specific procedures or guidances.

79.    In a section titled, "Report Any Illegal or Unethical Behavior," the Code of Conduct states the following, in relevant part:

> Even the most ethical companies can experience concerns around unethical conduct. For our risk management program to work, employees must be able to raise questions and report suspected problems. This reporting allows the Company to quickly provide guidance to navigate difficult situations and respond quickly to investigate suspected misconduct, and take decisive corrective actions to address the perceived problem.

You are expected to report actual or suspected violations of law, rules, regulations, policies or this Code. Reporting of violations is important to assure that the Company promptly detects, investigates, corrects, and reports violations, and prevents their recurrence.

80.     In a section titled, "Fair Dealing," the Code of Conduct states the following:

The Company is committed to dealing fairly with third parties at all times and seeks competitive advantages through superior performance but never through unethical or illegal business practices. The Company prohibits stealing proprietary information, possessing trade secret information obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies. You must respect the rights of and deal fairly with the Company's suppliers, collaborators, competitors, and their employees. Do not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair-dealing practice.

81.     In a section titled, "Public Communications," the Code of Conduct states the following, in relevant part:

The Company is subject to many regulations regarding how it communicates about its investigational products, clinical trials, and other business conduct. External communications about the Company's progress and investigational products must always be science-based, objective, fair, balanced, and not include claims of safety and efficacy.

You must never appear to speak publicly for the Company unless you are expressly authorized to do so. Company information, even that intended for business use, should only be communicated to the public by authorized Company spokespersons after review by the Vice President, Strategic Relations and/or the Chief Executive Officer. If you are asked to make an external presentation or write an article, first consult your supervisor, and be sure to follow applicable internal review procedures. If you are approached by the media, be courteous and professional, but do not volunteer information. Refer any media inquiries to the Vice President, Strategic Relations.

82.     In a section titled, "Clinical Research," the Code of Conduct states the following, in relevant part:

Inovio is working to reshape the future of treating and preventing cancer and infectious diseases. To achieve our mission, the science we perform must rest on a solid foundation of integrity. Inovio is committed to conducting research and

clinical studies in compliance with all applicable laws and regulations. We protect the health and welfare of those individuals who participate in our research efforts and clinical trials. We audit and monitor clinical study sites and processes related to our clinical trials.

83.     In a section titled, "Insider Trading," the Code of Conduct states the following, in

relevant part:

As a U.S. public company, Inovio and all its employees must comply with U.S. securities laws. This includes prohibitions on "insider trading," which is the purchase or sale of a company's stock made with knowledge of nonpublic material information about the company. "Material" information includes anything likely to influence a potential investor's decision to buy or sell stock. Just as it is improper for you to financially benefit from inside information, it is also improper for your friends, family, or news sources to profit. Trading on the basis of inside information is a criminal offense, and will result in immediate termination.

84.     In a section titled, "Financial Reporting and Controls," the Code of Conduct states

the following, in relevant part:

The Company requires honest and accurate recording and reporting of financial and other information in order to make responsible business decisions and full, fair, accurate, timely, and understandable financial and other disclosures to regulatory agencies and the public. The Company will maintain internal controls to ensure that transactions are properly authorized, assets are safeguarded, operations are conducted in accordance with Board of Directors and management directives and financial records are reliable. All of the Company's books, records, accounts, and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions, and must conform both to applicable legal requirements and to the Company's system of internal control.

The Company will maintain disclosure controls to ensure that required information is recorded, processed, summarized, and reported as required by law and regulation and within the time periods specified. Required information will be timely communicated to management as appropriate to allow timely decisions regarding disclosure. Financial statements for external purposes will be fairly presented in conformity with generally accepted accounting principles accepted in the United States or other applicable standards as required by law or regulation. Public statements and filings regarding 13 the Company's business and financial status must be true, accurate, complete, timely, understandable, and not misleading. Unrecorded or "off the books" funds or assets will not be maintained unless permitted by applicable law or regulation. No false or fictitious entries may be made on the Company books and records.

85.     In a section titled, "Protection and Proper Use of Company Assets," the Code of

Conduct states the following:

> You must protect the Company's assets and ensure their efficient and lawful use. Theft, carelessness, and waste have a direct impact on the Company's profitability. Any suspected incident of fraud, theft, or improper use of Company assets should be immediately reported to your supervisor, the Legal Department, or via the reporting hotline.
>
> Company equipment, including communications and computer equipment, goods, and services should not be used for non-Company business. Incidental personal use is permissible, but must remain reasonable, limited, appropriate and ethical, and not affect business transactions or your productivity. Using Company assets or information for personal gain is prohibited.
>
> All transactions must be properly authorized. You must be aware of the limits of your authority and you may not engage in transactions that are beyond the limit of your authority.

86.     In a section titled, "Records Management," the Code of Conduct states the

following:

> Company records are important corporate assets. Records should always be retained or destroyed according to the applicable law and the Company's Records Retention Policy. Records relevant to a pending or threatened government or Company investigation or other legal action must not be destroyed. In the event of litigation or government investigation, you should consult the Company's Legal Department for instructions on document retention.

87.     In a section titled, "Careful Communication," the Code of Conduct states the

following, in relevant part:

> Business records and communications often become public and you should avoid exaggeration, humor or sarcasm, derogatory remarks, guesswork, or inappropriate characterizations of people and companies. Seemingly harmless statements can be misconstrued when reviewed by government regulators, adversaries in litigation, or courts. This guidance applies equally to e-mail, internal memos and formal reports.

88.     In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

materially false and misleading statements to the public and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of

control, gross mismanagement, and waste of corporate assets, as well as the aiding and abetting

thereof. Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in

insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to

maintain the accuracy of Company records and reports, comply with laws and regulations, conduct

business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

89.     Inovio is a Pennsylvania-based biotechnology company that researches, develops,

and markets DNA medicines designed to treat a variety of cancers and infectious diseases.

90.     In December 2019, the city of Wuhan, China, experienced the first outbreak of

COVID-19. Since then, the outbreak has rapidly escalated, with the World Health Organization

("WHO") officially classifying the outbreak as a pandemic on March 11, 2020.[1] According to the

Center for Systems Science and Engineering at Johns Hopkins University, as of April 2020, over

1.41 million cases of COVID-19 have been reported across the globe, which have resulted in an

estimated 81,200 deaths.[2]

91.     The United States has been particularly hard-hit by the COVID-19 pandemic, and

has reported almost 400,000 cases, and over 12,000 deaths as of April 2020.[3] The pandemic has

also radically altered day-to-day life in the country—many states have ordered all non-essential

---

[1]  https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited April 8, 2020).

[2] https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd4029942346
  7b48e9ecf6 (last visited April 7, 2020).

[3] https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd4029942346
  7b48e9ecf6 (last visited April 7, 2020).

personnel to work from home, cancelled classes at public schools and universities, banned large public gatherings, and in some cases, declared general states of emergency.

92.     COVID-19 is a "novel" coronavirus—in other words, it is a new strain of virus that prior to December 2019, had never before been identified in humans. As such, no vaccine for COVID-19 presently exists. In light of the seriousness of the pandemic and the ongoing danger to human life on a massive scale, medical and scientific institutions across the world—including a number of biotechnology firms—have quickly mobilized to begin working on a COVID-19 vaccine. At least 20 such vaccines are currently being developed, and though research and clinical trials are proceeding at a much faster pace than would be appropriate under normal circumstances, it is generally expected that it will still take over a year for a viable vaccine to be ready for mass-production.[4]

93.     During the Relevant Period, the Individual Defendants capitalized on this ongoing global crisis by repeatedly representing to the public that Inovio had in fact already developed a COVID-19 vaccine, amazingly, "in about three hours."

94.     These representations, simply put, were falsehoods. Inovio had not developed a COVID-19 vaccine, but rather, a "vaccine construct"—a mere precursor to a fully-fledged vaccine.

**False and Misleading Statements**

***February 14, 2020 Fox Business Interview***

95.     On February 14, 2020, Defendant Kim was interviewed by Neil Cavuto on the Fox Business channel. During the televised interview, Defendant Kim declared that Inovio had already developed a vaccine for COVID-19, stating the following:

---

[4] https://www.bbc.com/news/health-51665497 (last visited April 8, 2020).

Inovio doesn't need to see or get hold of the virus to make a vaccine, rather, we just need the genetic sequence of that, *so within three hours of accessing that, after the Chinese authorities made it available, we're able to construct our vaccine, INO-4800, in about three hours.*

\* \* \*

*We're preparing for clinical trials to start in the U.S. early this summer.*

\* \* \*

*We have it*, and we've proven that we can do this for other infections like MERS and Zika in the past.

(Emphasis added.)

96.     On this news, investor analysts issued strong "buy" recommendations for Inovio, and the price of the Company's stock surged by over 10% over the course of the next several trading days, from $3.86 per share at the close of trading on February 13, 2020, to $4.22 per share at the close of trading on February 18, 2020, on heavy volume.

**February 21, 2020 The Scientist *Interview***

97.     On February 21, 2020, *The Scientist* published an article detailing an interview with Defendant Weiner.[5] During the interview, Defendant Weiner described an ongoing collaboration on the development of a COVID-19 vaccine between Inovio and the Wistar Institute, a biomedical research center where Defendant Weiner serves as Executive Vice President and Director. The article quoted Defendant Weiner, and described his involvement in the development of a COVID-19 vaccine, in relevant part, as follows:

"We had been paying very close attention to the [COVID-19] cases increasing over Christmas in China," Weiner tells *The Scientist*. As soon as the COVID-19 genetic sequences became available in January, Weiner's team, and collaborators from Inovio, Université Laval, the National Institutes of Health's Rocky Mountain Laboratories, and elsewhere, started designing DNA cassettes that encode proteins of SARS-CoV-2, the virus that causes COVID-19.

---

[5] https://www.the-scientist.com/news-opinion/newer-vaccine-technologies-deployed-to-develop-covid-19-shot-67152 (last visited April 8, 2020).

* * *

"no one can really be sure what will work, but you tend to want to focus on things that are important for entry," Weiner says.

98.    Notably, the article did not quote Defendant Weiner as commenting on whether Inovio had already developed a COVID-19 vaccine.

### *March 2, 2020 White House Meeting*

99.    On March 2, 2020, Defendant Kim participated in a televised roundtable meeting with President Donald Trump, Vice President Mike Pence, and the heads of other biotechnology and pharmaceutical companies to discuss the development of treatments for COVID-19. During the meeting, Defendant Kim reiterated the claim that the Company had already developed a COVID-19 vaccine "within three hours," stating the following:

> Mr. President, Mr. Vice President, my name is Joseph Kim.  I run a company called Inovio Pharmaceuticals out of Pennsylvania.  We're a proud American biotech company with R&D and manufacturing in California as well.
>
> Inovio is the leader in coronavirus vaccine development in the world.  We have a phase two product for related MERS coronavirus vaccine in phase two stage.  When the new outbreak occurred, we applied our very innovative 21st century platform called DNA medicines platform to COVID-19.  ***By getting just the DNA sequence of the virus, we were able to fully construct our vaccine within three hours.***  And we've been working on preclinical and preparation work with the help of the FDA in acceleration and really working very well together.
>
> ***Our plan is to start the U.S.-based clinical trials for COVID-19 vaccine in April of this year; followed by, shortly thereafter, a trial in China, in South Korea.***  There are a lot more infections in those areas.

(Emphasis added.)

100.    Analysts reacted favorably to these pronouncements, and the price of the Company's stock shot up once again, from $4.39 per share at the close of trading on March 2, 2020, to $7.45 per share at the close of trading on March 3, 2020. The Company's stock price

continued to rise over the course of the next several trading days, reaching $14.09 per share at the close of trading on March 6, 2020.

### March 9, 2020 Form 8-K

101.   On March 9, 2020, the Company filed a current report on Form 8-K with the SEC announcing an agreement to sell $50 million worth of shares of its common stock on the open market. The Form 8-K also commented on the purported timeline for the development of the Company's COVID-19 vaccine, stating the following:

> On March 3, 2020 the Company announced that it plans to pursue an accelerated timeline for developing its DNA vaccine INO-4800 to address COVID-19, also known as coronavirus. ***The Company believes it may be in a position to begin human clinical trials in the United States in April 2020 and soon thereafter in China and South Korea***, subject to approval by the U.S. Food and Drug Administration and China and South Korea regulatory authorities, respectively, and aims to produce up to one million doses by the end of 2020, with its existing capacity and contract resources, for further clinical trials or emergency use.

(Emphasis added.)

102.   The statements in ¶¶ 94, 96–98, and 100 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that (1) Inovio had not developed a viable COVID-19 vaccine in only three hours, but rather a vaccine construct; (2) the Company had no reason to believe that clinical trials for Inovio's purported COVID-19 vaccine would begin as soon as April 2020; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Emerges**

103.    On March 9, 2020, Citron published the below statement on their Twitter account, sounding the warning bells as to the Individual Defendants' false statements regarding Inovio's purported COVID-19 vaccine:



104.    Later that same day, the Company issued a statement on its own Twitter account addressing Citron's Twitter post. The Company's Twitter statement admitted that Inovio had indeed not yet developed a COVID-19 vaccine, but merely a construct for a potential vaccine, stating the following:

> Dear shareholders,
>
> A third-party report today demonstrated a lack of understanding of the science behind DNA medicines. ***Inovio designed a vaccine construct for its coronavirus vaccine (IN0-4800) within three hours after the viral sequence was publicly available***; produced the vaccine at small scale and was in preclinical trials in January-preclinical results are available online in Nature Communications. Inovio expects to move into human trials next month.
>
> Based on extensive prior work creating DNA vaccines using our proprietary DNA medicines platform, we are confident that we have a viable approach to address the COVID-19 outbreak.
>
> We remain committed to sharing our progress as we advance into the clinic in the coming weeks.

(Emphasis added.)

105.    On this news, shares of Company stock, which had traded as high as $19.36 per share during intra-day trading on March 9, 2020, plunged from $14.09 per share at the close of trading on March 6, 2020, the prior trading day, to $9.83 per share at the close of trading on March 9, 2020. The Company's share price continued to fall the next day, plummeting to $5.70 at the close of trading on March 10, 2020. In total, this two-day stock drop represented a loss in value of more than 59%, and erased roughly $643 million in market capitalization for the Company.

106.    Also on March 9, 2020, Bloomberg published an article commenting on Citron's remarks on the Company, and on the Individual Defendants' misleading representations, stating the following, in relevant part:[6]

> Inovio Pharmaceuticals Inc.'s meteoric rise on the back of hype for a vaccine to treat the coronavirus drew the ire of noted short-seller Citron Research, as the firm slapped a $2 target on the drug maker.
>
> * * *
>
> The stock has seen a massive flood of trading activity as retail investors and day traders flipped shares amid hopes that the company can deliver a vaccine to combat the fast-spreading virus. Shares surged as much as 37% on Monday morning, extending a year-to-date rally that briefly topped 480%, before traders circulated Citron's claims.
>
> * * *
>
> "We're not going to lend credibility to this report or this outlet with a response," an Inovio spokesperson said by telephone. The company has highlighted claims it designed a vaccine candidate in just three hours. It plans to present the results of human trials by the fall and deliver 1 million doses for further studies or emergency use by the end of the year, according to a March 3 release.
>
> * * *
>
> Citron is the latest skeptic to voice concern about the company and its plans to develop a vaccine, pointing to decades of over-promising and under-delivering.

---

[6]      https://www.bloomberg.com/news/articles/2020-03-09/citron-delivers-blow-to-inovio-s-surging-stock-amid-vaccine-hope (last visited April 8, 2020).

Short sellers have pointed out that the drug maker has never successfully developed a medicine and has previously promoted plans to combat pandemic threats like Ebola in 2014 and Zika in 2016.

## DAMAGES TO INOVIO

107.     As a direct and proximate result of the Individual Defendants' conduct, Inovio will lose and expend many millions of dollars.

108.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and its CEO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

109.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

110.     As a direct and proximate result of the Individual Defendants' conduct, Inovio has also suffered and will continue to suffer higher financing costs, a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

111.     Plaintiffs bring this action derivatively and for the benefit of Inovio to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Inovio, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, as well as the aiding and abetting thereof.

112.     Inovio is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

113.    Plaintiffs are, and have been at all relevant times, shareholders of Inovio.  Plaintiffs will adequately and fairly represent the interests of Inovio in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

114.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

115.    A pre-suit demand on the Board of Inovio is futile and, therefore, excused.  At the time of filing of this action, the Board consists of Defendants Kim, Benito, Miller, Shepard, Weiner, Yarno, and Zoth (collectively, the "Directors"). Plaintiffs need only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

116.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of the Directors engaged in insider sales based on non-public information, netting proceeds of approximately $63,000, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

117.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the

Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

118.    Additional reasons that demand on Defendant Kim is futile follow. Defendant Kim has served as the Company's President, CEO, and as a director since 2009, and he currently serves as a member of the Finance Committee. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Kim with his principal occupation, and he receives handsome compensation, including $2,588,534 during fiscal year 2019. Defendant Kim was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings and those made during the interviews referenced herein, nearly all of which he either personally made or authorized. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Kim is a defendant in the Securities Class Action. For these reasons, Defendant Kim breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    Additional reasons that demand on Defendant Benito is futile follow. Defendant Benito has served as the Chairman of the Board since January 2019, and as a director since 2003. He also serves as the Chair of the Finance Committee, and as a member of the Audit Committee and the Nomination and Corporate Governance Committee. Defendant Benito has received and continues to receive compensation for his roles within the Company as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in

the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Benito breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120.    Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since March 2019. She also serves as a member of the Audit Committee and the Compensation Committee. Defendant Miller has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Miller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

121.    Additional reasons that demand on Defendant Shepard is futile follow. Defendant Shepard has served as a Company director since January 2020. He also serves as a member of the Finance Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Shepard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122.    Additional reasons that demand on Defendant Weiner is futile follow. Defendant Weiner has served as a Company director since March 2016. He also serves as Chairman of the Company's Scientific Advisory Board. Defendant Weiner has received and continues to receive compensation for his roles within the Company as described herein. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale before the fraud was exposed, which yielded approximately $63,000 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, Defendant Weiner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123.    Additional reasons that demand on Defendant Yarno is futile follow. Defendant Yarno has served as a Company director since December 2017. She also serves as the Chair of the Compensation Committee, and as a member of the Nomination and Corporate Governance Committee. Defendant Yarno has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Yarno breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

124.    Additional reasons that demand on Defendant Zoth is futile follow. Defendant Zoth has served as a Company director since January 2019. She also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee and the Finance Committee. Defendant Zoth has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Zoth breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

125.    Additional reasons that demand on the Board is futile follow.

126.    As described above, Defendant Weiner directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendant Weiner received proceeds of approximately $63,000 as a result of an insider transaction executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to him, and excused.

127.    Defendants Benito, Miller, and Zoth (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's internal audit function, the Company's internal controls, and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to ensure the integrity of the Company's internal controls and compliance with legal and regulatory requirements, as they are

charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading statements to the public. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

128.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  For instance, Defendants Kim, Benito, Miller, and Yarno have all had long careers at Merck & Company, Inc., with each holding various positions at that company between 1994 and 1999. Additionally, Defendants Benito and Shepard both served as directors of DURECT Corporation between 2013 and 2016. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

129.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, as well as the aiding and abetting thereof. In further violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest and unlawful insider trading, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct.  Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

130.    Inovio has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Inovio any part of the damages Inovio suffered and will continue to suffer thereby.  Thus, any demand upon the Directors would be futile.

131.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

132.    The acts complained of herein constitute violations of fiduciary duties owed by Inovio's officers and directors, and these acts are incapable of ratification.

133.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Inovio.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Inovio, there would be no directors' and officers' insurance protection.  Accordingly,

the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought

derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists,

will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is

futile and, therefore, excused.

134.    If there is no directors' and officers' liability insurance, then the Directors will not

cause Inovio to sue the Individual Defendants named herein, since, if they did, they would face a

large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

135.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of

them, at least four of the Directors, cannot consider a demand with disinterestedness and

independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

136.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth

above, as though fully set forth herein.

137.    Each Individual Defendant owed to the Company the duty to exercise candor, good

faith, and loyalty in the management and administration of Inovio's business and affairs.

138.    Each of the Individual Defendants violated and breached his or her fiduciary duties

of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

139.    The Individual Defendants' conduct set forth herein was due to their intentional or

reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the

rights and interests of Inovio.

140.    In breach of their fiduciary duties owed to Inovio, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that (1) Inovio had not developed a viable COVID-19 vaccine in only three hours, but rather a vaccine construct; (2) the Company had no reason to believe that clinical trials for Inovio's purported COVID-19 vaccine would begin as soon as April 2020; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

141.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

142.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

143.    Additionally, one of the Individual Defendants breached his fiduciary duties by engaging in an insider sale while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact referenced herein.

144.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or

recklessly and for the purpose and effect of artificially inflating the price of Inovio's securities and disguising insider sales.

145.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Inovio's securities and engaging in insider sales.

146.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

147.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Inovio has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

148.    Plaintiffs on behalf of Inovio have no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

149.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

150.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Inovio.

151. The Individual Defendants either benefitted financially from the improper conduct and their engaging in insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Inovio that was tied to the performance or artificially inflated valuation of Inovio, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

152. Plaintiffs, as shareholders and representatives of Inovio, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

153. Plaintiffs on behalf of Inovio have no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Abuse of Control

154. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

155. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Inovio, for which they are legally responsible.

156. As a direct and proximate result of the Individual Defendants' abuse of control, Inovio has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Inovio has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

157. Plaintiffs on behalf of Inovio have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

158.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

159.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Inovio in a manner consistent with the operations of a publicly-held corporation.

160.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Inovio has sustained and will continue to sustain significant damages.

161.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

162.    Plaintiffs on behalf of Inovio have no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

163.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

164.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

165.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Inovio to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to

engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

166.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

167.    Plaintiffs on behalf of Inovio have no adequate remedy at law.

## SIXTH CLAIM

**Against Defendant Kim for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

168.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

169.    Inovio and Defendant Kim are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Kim's willful and/or reckless violations of his obligations as CEO of Inovio.

170.    Defendant Kim, because of his position of control and authority as CEO of Inovio, was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Inovio, including the wrongful acts complained of herein and in the Securities Class Action.

171.    Accordingly, Defendant Kim is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

172.     As such, Inovio is entitled to receive all appropriate contribution or indemnification from Defendant Kim.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiffs may maintain this action on behalf of Inovio, and that Plaintiffs are adequate representatives of the Company;

(b)     Declaring that the Individual Defendants have breached their fiduciary duties to Inovio;

(c)     Determining and awarding to Inovio the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Inovio and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Inovio and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Inovio to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations.

      (e)    Awarding Inovio restitution from Individual Defendants, and each of them;

      (f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

Dated: June 15, 2020              Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jacob Goldberg*
Jacob Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiffs*

## **VERIFICATION**

I,   Krishna Kishor Devarakonda   am   a   plaintiff   in   the   within   action. I  have  reviewed  the  allegations  made  in  this  shareholder  derivative complaint,  know  the  contents  thereof,  and  authorize  its  filing.  To  those allegations   of which   I have   personal  knowledge,   I believe   those  allegations   to be  true.  As to   those  allegations  of  which  I  do  not  have  personal  knowledge,  I rely  upon  my counsel  and  their  investigation  and  believe  them  to be  true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _6/12/2020_, 2020.

*Krishna Kishor Devarakonda*

────20B0182A24B140A...

Krishna Kishor Devarakonda

**<u>VERIFICATION</u>**

I, Brian Foster am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 6/12/2020 , 2020.

DocuSigned by:

679A5DC6B203443...

_____

Brian Foster